1130, Allergan v. Teva Pharmaceuticals. Allergan v. Teva Pharmaceuticals USA, Inc. Good morning, Your Honors. May it please the Court, Jonathan Singer for appellants. In assessing unexpected results in this case, the District Court made two errors that dramatically affected the outcome. First, the District Court elevated a statistical analysis of Phase II as confidential in place of what the prior reference actually said about the Phase II and, perhaps more importantly, what skilled artisans require of Phase IIs. There's so much going on in this case. Is this, I don't want to say anything that's confidential, is this the Shermer tier test? Is that what we're talking about or is it something else? What we're talking about is an analysis of, if you will, Your Honor, an analysis of confidential Phase II data that has now been made public, so it's not that confidential in that sense. Oh, okay. Versus, people can know, versus looking at what the prior art said and setting the expectation for what would be an unexpected result. I think that the Court's authorities And that's, in your view, a legal error? That's a legal error in requiring a statistical analysis of that data versus looking at what the prior art actually says. The overall effect of that was to essentially take statements that were made in the prior art reference and they were rendered, if you will, annulled. And in fact, the District Court's opinion did not mention perhaps the most significant statement in the Stevenson reference, which stated that the most consistent results in the Sister Shermer testing, Your Honor, were achieved by the .1 formulation. And that was not addressed by the District Court in its decision, and that's because the District Court rejected that claim, that statement, in the prior art based on the analysis of the confidential Phase II data. And I think it's important because the prior art uses this language of comparison. The prior art here is comparing one formulation to another to treat that prior art for what it says. In using comparisons, it proves the point, if you will, Your Honor, that using a statistical analysis to assess it is inappropriate. And the District Court erred in doing that. But what about using a statistical analysis not to replace it but to compare? I think the statistical analysis was used to compare in respect to the Phase III, Your Honor. And I think there's nothing wrong with considering it there. Because I think as our colleagues on the other side said, you're allowed to judge whether or not the unexpected result actually occurred. But in setting that baseline of what persons of skill in the art would expect, because that's what we're trying to address, you have to look at what the prior art actually said. And I think it's important, particularly with the Phase II. In the Phase II, the District Court's opinion is at cross-odds with itself. It says that the Phase II was not designed to yield statistically significant differences between the various formulations and then found, not surprisingly, that there weren't any. And that therefore, persons of skill would treat all these things the same because there weren't statistically significant differences. But that's not what people of skill were doing. They knew that this study wouldn't yield statistically significant differences, but nonetheless were using it for the very purpose that the District Court said that they would not, which is to make comparisons between the various formulations to figure out which ones to move forward with. So I believe that's a legal error. Certainly the overall result of the overall assessment of unexpected results of the court's authorities are clear. That's an issue of fact. But this point of looking to confidential information, going behind the prior art, if you will, to use an assessment of statistics in contradiction to what the prior art says is error. I think the second point that I would say dramatically affected the outcome of the case was in assessing both the Phase 2 and Phase 3 again in the unexpected results inquiry, the District Court weighed each measure identically, both giving weight to really counting noses, if you will. And I think the court's opinion is very clear on that point in terms of counting which ones were statistically significant and which ones were not. And the claims, of course, require increased enhanced tear production, an actual therapeutic treatment of the disease. And the case was replete with evidence. I don't think either side really argued this point, that the art was searching for something that would in fact treat the disease, i.e. would in fact enhance tear production. And by treating each thing the same, the District Court elevated those things that didn't indicate whether or not there was a therapeutic success over those things that did indicate there was a therapeutic success. So, Counselor, in your view, did the Dean 1 reference disclose the formulations of the claimed amounts? I'm sorry? Did the Dean 1 reference disclose the formulations of the claimed amounts? It disclosed a range that encompassed the claimed amounts, Your Honor. But within that range, it disclosed the formulation. Right. In the range, there's no dispute here, that in the ranges in Ding, the formulation of the patents ensued fell within those ranges. And so this court's range case law, I think both sides have argued different aspects of that case law. This court's range case law is applicable. And interestingly, the Ding 1... It's applicable in that there's a prima facie case of obviousness. That's what this court's authorities say, whether it's a presumption or prima facie or there's a... I mean, it's semantics we've been arguing about, important ones nonetheless. But yes, we acknowledge that that is what this court's authorities say. And then the question becomes, in terms of the burden-shifting approach, or burden-shifting isn't the right word, the burden of production that this court places on parties like Allergan is to come forward with evidence of unexpected results, teaching away a result-oriented... And to be sure, it's not the burden of persuasion that shifts, it's the burden of production. Absolutely. And that's critical here, in the sense that Allergan came forward. That's what the trial was about, was whether Allergan had satisfied that burden in showing unexpected results. And therefore, in making errors in assessing what measures were relevant, what the prior art said, in setting the expectation, Allergan didn't have a chance, if you will. If statistics are going to be required, if statistically significant differences are going to be required in Phase 2, then no one's going to be able to meet that standard in setting the expectation. Because, frankly, the studies are too small. And if you have a prior art reference, Judge Reinert, that says, flat out, that one formulation is the most consistent in the measure that is most significant, the actual objective measure, the court ought to rely on that. And not go behind it to make a determination at page A51 of the district court's opinion, that the P values for that difference weren't significant enough. The prior art said what it said. With respect to the second error, if you will, the weighing of each measure the same, that is where the FDA's ultimate, if you will, judgment on the ultimate efficacy of this product comes in. There's a lot of dispute between the parties as to what the measures are appropriate and what are not. And the FDA is the agency charged by all of us to assess whether products are safe and efficacious, such that they can be marketed. And the FDA determined, again, looking at statistics and using those statistics in the way that persons of skill used them, that the .05 formulation was, quote, favored over the .1 formulation. And the district court rejected that finding, again, because the district court went behind that analysis to say, well, that's not a difference between two formulations, statistically. Something being favored, that's not enough. It has to be statistically significantly different than each other. Again, when the studies aren't designed to show that. What we're trying to show when we're getting drugs approved at the FDA is whether things are different than placebo or vehicle. And I submit to you... Isn't there a difference between something being favored and unexpected results? I mean, you can have a range of options that work. One of them may work better than the other, but that doesn't mean that the slightly less better one or the slightly more better one is unexpected. It's just better. That's the difference in degree and kind, if you will. Right. I mean, unexpected results is usually, well, we're plucking this point out of the range, and nobody would have predicted that it would have had this effectiveness, because everything else points to a completely different part of the range. But the differences here seem pretty minor. And isn't that what the district court was focusing on, was that the .1 probably worked okay, but the .5 works a little bit better, or maybe a lot better? Well, actually, I think you have to take the prior art for what it says. And the .05 was in the prior art. The prior art paper, Stevenson paper, was not shown to work at all based on the objective measures of tear protection. It wasn't even mentioned in the prior article not working at all. And in the corneal staining and other staining measures, it was the worst performing and essentially didn't perform to improve. But there's other evidence that points the other way. I mean, I know your friend on the other side is going to get up and start pointing us to all that evidence. Do you think we should just disregard it? I'm not saying you should disregard the other evidence. But that other evidence doesn't point to, if you will, Judge Hughes, the surprising result. You have to remember is the increasing the castor oil component, that taking that formulation that's in the prior art reference that's described, the .05, looking at the data in there, seeing the lack of performance on the objective measures, some improvement on subjective measures which don't relate to the claims, and then say, okay, we're going to double the amount of the vehicle, which all the evidence at trial would suggest would hamper the formulation, that's the surprising result. So you're suggesting, just going back to Judge Raynor's question about the legal standard we're applying, and Judge Hughes just referenced it, the test is that it requires a difference in kind, not just a degree. That's correct. And so Judge Bryson here evaluated the results and concluded they were not unexpected in terms of a difference in kind, not a degree. That's the universe we're operating in. That is correct. That was his ultimate decision. But again, it was based on setting the expectation, based on that confidential analysis of the statistical data versus what the prior art said. You're running out of time, but I'd like, before you sit down, if you could address the blocking patents issue. Absolutely. And the blocking patent issue here is, we'll state our disagreement with the Accorda decision, but we recognize now that that has come out. And so what the blocking... Wait, I'm sorry, I didn't understand what you just said. You're not... We understand the Accorda decision has now come out. Okay. So the framework that the parties were briefing, a little bit different than what they were briefing initially. But the issue there on the blocking patent is that there was evidence presented at trial that these patents, or the patent, the DING-1 patent, was not, in fact, sufficiently regarded as strong enough, if you will, to be a blocking patent. The whole rationale for a patent being a blocking patent is the assumption that by that patent foreclosing, if you will, the later formulation. Are you saying that the blocking aspect of a blocking patent lies in the strength of the patent versus its activity in the marketplace? Certainly. That has to be relevant, Your Honor. If people do not believe that that patent has sufficient strength, if they believe it to be not blocking other things that they might do, because they'll do it, it'll still be covered, that has to be part of the inquiry. Isn't that the patent that has the range that covers this specific formulation? It does, Judge Hughes, but that patent did not prevent, that patent also would cover other activities with cyclosporine. People using 0.1 cyclosporine, 0.2 cyclosporine. And the evidence at trial was that those people didn't, well, the evidence at trial was that people tried and attempted to use 0.1 and 0.2 cyclosporine. It has to affect the analysis of a blocking patent, and the district court did not assess this, that people looking at this patent, which is described as a blocking patent, did not regard it as a blocking patent. And that's, I believe, what the Accorda case says, that this is a fact-specific inquiry as to whether things are, in fact, blocking patents or not, under the economics. Right? I will... Good morning. May it please the Court. This is a case about unexpected results, and Allergan lost that case at trial on the fact. Allergan tried to tell a story at trial in which the 0.1% formulation of cyclosporine performed better in the Phase II trials than the 0.05%, and then the 0.05% supposedly, surprisingly, performed better than 0.1% in the Phase III trials. And this is the basis of their unexpected result. The problem that Allergan has is that the district court found, in an uncommonly thorough and detailed 135-page-long opinion, that as a matter of fact, the two formulations in the Phase II trial performed just about the same, and the two formulations in the Phase III trial performed just about the same. And, to the extent... I think that that all makes sense. What I hear your friend arguing is, we shouldn't look at any of that stuff because the actual prior references said something different. That's not accurate, Your Honor. And, again, the district court was very careful to look at the references themselves and the publicly available information in determining what expectations a person of skill in the art would have formed. And so, for example, the district court looked at the Stevenson reference, which was the publication that described the results of the Phase II trials, and one can look at the face of Stevenson and see the key results. It says, and this can be found at page 19200 of the Joint Appendix, that the results on the face of the reference are there was no clear dose-response relationship between .01 and .05. There wasn't a superior performance, in other words, by the higher dosage of the drug. And it says that the point... And contrary to what Mr. Singer suggested, the district court, of course, was very careful to look at exactly what the reference described, and you can find at page 42 of the court's opinion the discussion of the fact that on some measures the .1 percent performed better and on other measures the .05 percent performed better. What Stevenson says in black and white is cyclosporine A .01 percent produced the most consistent improvement in objective and subjective endpoints, and .05 percent gave the most consistent improvement in patient symptoms. And the vehicle also performed well, perhaps because of its long residence time on the ocular surface. So the vehicle, which is to say the emulsion that has the castor oil in it but no cyclosporine, itself created better results over baseline than the versions that have the cyclosporine in it. And so the conclusion of Stevenson is that cyclosporine A .05 percent and .1 percent were deemed the most appropriate formulations for future clinical studies, which is exactly what then happened in Phase 3. Those two formulations were put into the Phase 3 studies. So what the district court found, based on Stevenson, was that a person of skill in the art, seeing no dose response, seeing that all of the formulations tested had few to no side effects, had negligible blood concentrations, would have thought that there wasn't a better performance by the higher dose. How do you respond to your colleague on the other side's argument that the district court erred when it relied on an assessment of statistical analysis to the detriment of the teachings of the prior art? That's not at all what the district court did, Your Honor. I think, first of all, the court was very careful in its analysis to distinguish between what was publicly available and what was confidential information with regard to the FDA submissions. However, when the unexpected result is supposedly that .05% performed surprisingly and unexpectedly better in the Phase 3 trials, it is fair to look at the available data quite apart from, not to figure out what a person of skill in the art would have expected, but to find out whether there actually is a difference in effect at all that would be surprising or would not be surprising. And so what the court did was to, having evaluated first the publicly available information and concluded that a person would have thought they did the same, the .05% and the .1% performed the same in Phase 2 and in Phase 3, the court then looked at the underlying data to see if perhaps there was a difference in effect that was not reflected in the publicly available information and concluded that no, even if one looks at the underlying data, one sees no difference in performance. And I think it's not correct to suggest that the district court required statistical significance instead of considering what people of skill in the art would have thought. At page 49 of its opinion, the court specifically said it was not requiring statistical significance as the test of unexpected results. What the court did, though, was to evaluate, and of course there was testimony from our experts, the other side's experts were not the only ones to put in evidence. Our experts testified that people would read the prior art and expect no difference. And even to the extent that people would have been surprised in 1999 when the Phase 3 trials came out, any surprise that they would have had would have been gone by 2003, which is the relevant time point for people of skill in the art looking at these facts. So it's just not true that the court required statistical significance in order to find an unexpected result. I would note, in addition, that it's one thing that the argument that Allergan makes, at one point in its brief, is that people of skill in the art sometimes can reach conclusions or make expectations without having the benefit of statistically robust studies, which is, of course, true. But it's one thing to say that people of skill in the art can form expectations in the absence of statistical evidence. It's another thing to say, which is what they have to say here, that given statistical evidence that there is no difference in performance, a person of skill in the art is nevertheless free to say, well, I don't care about the statistics. I look at the graphs on my own, and without regard to statistics, I make my own conclusions. That's what the district court rejected. So I think, again, as a matter of fact, it's simply not true that there was an unexpected result. The evidence on that is really extremely strong. On the question of the legal standard, it doesn't sound to me like we have a difference in opinion on that. I think everyone agrees that there is a prima facie case of obviousness because the Restasis formulation fell within the ranges disclosed in the Ding-1 patent, that it's then up to the other side to come forward with evidence of unexpected results if it wants to overcome that prima facie case. And that's what they failed to do here. And therefore, the prima facie case stands and invalidates the patent. That's essentially what the district court found. What about the blocking patent? So the district court considered that there was, that the product was commercially successful and that there was, for at least some people, a long-felt need, but said correctly under this court's precedence that the effect of those secondary considerations was blunted by the existence of the Cas1-342 patent and the Ding-1 patent, which revealed the solution to the problem but prevented other people from experimenting with or carrying out that solution. In your view, did Accorda raise the kind of evidence or the discussion? I mean, Judge Bryson didn't have the benefit of Accorda when he issued his opinion here. Did Accorda change the landscape or require anything further from district courts than Judge Bryson did here? No, Your Honor, I don't believe it did. I think that we could go all the way back to the Merck versus Teva case and the Galderma versus Tolmar case. Well, he relied on those cases. Those were law, and then Accorda came out and amplified that a little. Well, I think, pardon me. In Accorda, we defined a blocking patent as one where practice of a later invention would infringe an earlier patent. How do we look at the word practice? Were the patents in this case, were they being practiced? Well, I think the point of that passage in Accorda is that even though Ding One made it obvious... In other words, does there have to be commercialization in order for there to be a practice of a later invention or just simply possessing and owning the patent? Is that enough? Yes, I believe that possessing and owning the patent is enough if it's a blocking patent because obviously the point of the blocking... Even where there's no commercialization of the patent? Yes, because the point is that... So the logic of the commercial success as a secondary consideration of non-obviousness is that where there's an economic incentive to solve a problem and where the solution is obvious, people will bring a product to market that solves the problem, and then later products to market won't be as successful. The fact here is that even though Ding One told the whole world how to make these kinds of emulsions and the patent, the Resthesis formulation, is just one sort of example from the set of Ding One that doesn't perform any better or worse than any of the other examples in the set from Ding One, people weren't free to use Ding One as a blueprint to bring their own products to market because they infringed... They would have infringed Ding One if they tried to do that. And we know, of course, here, that Allergan intended Ding One and Cas1 to be blocking patents because they listed them in the Orange Book specifically for the purpose of preventing other people from bringing competing products to market. So it's a little ironic for them to say that, you know, we don't know if anyone else was blocked. Well, then why did you list it in the Orange Book? It was clearly their intent to block other people from doing it. To go back to your question, Chief Judge Prost, I don't think that Accorda changed that framework. Well, Accorda seems to call out that it's a factual inquiry. It's not different from what we've said before, but it kind of talks again about the need for evaluating the facts and circumstances. So based on what you've said, what more of a fact or circumstance would you look to other than the fact that this prevented others from going on the market? Well, I think that what Accorda was doing when it talked about the facts and circumstances, it was responding to the comments in the Merck, Sharpe, and Doan against Hospira case, which suggested that a categorical rule that simply saying if there's more than one patent covering the product, therefore, we throw out commercial success, we don't look at it. I think that Accorda was saying that's a sensible rule. We can't have a categorical approach to this sort of thing, but one has to be sensitive to the possibility that what at first appears to be a blocking patent may not end up blocking it, for example, because people are willing to license it. And in this very case, the Cas1 342 patent was developed at the University of Georgia and owned by Sandoz, but Sandoz was willing to license it to Allergan, and that's why Allergan was able to develop its products. And so although Cas1 was a blocking patent after Allergan got the exclusive license, it wasn't necessarily a blocking patent when it was owned by someone else who was willing to license it. I think those are the kinds of factual nuances that Accorda permits people to consider when they are in the record, but Accorda doesn't say that there has to be some searching examination of additional facts. I think what Accorda says is that based on the limited evidence that's usually available on these sorts of things, the district court has to make a judgment, and that's what the district court did here. I would also point out that there was evidence in the record that these were blocking patents and that that evidence went uncontested by the other side. The court can find that at JA 18-864-65, which is economist's testimony on the blocking effect of the patent in the market and the fact that by 2014, when DING-1 expired, Allergan's position with Restasis had become so dominant that it was not an attractive molecule to compete with. So, I would just add one other point going back to the obviousness question. Mr. Singer ended with the notion that the surprise here was that the 0.05% formulation did as well in the phase three trials as 0.1 even though it had a higher concentration of castor oil. And of course, there was plenty of evidence at trial that castor oil can be a good thing, that castor oil is good for treating dry eye, and in fact, the DING-2 patent, the 607 patent, specifically says that the installation of the castor oil emulsion without the cyclosporine increases the measured tear volume, and that can be found at Joint Appendix 19-476. So, there was plenty of evidence from which people in the art would have thought that increasing the castor oil was a perfectly sensible thing to do, and in fact, DING-1 had examples in which the ratio of cyclosporine to castor oil was the same as that used in the Restasis product, and they were found to be perfectly suitable emulsions to use for the treatment of dry eye. And so, this notion that there was some kind of problem with increasing castor oil is a figment of Allergan's imagination. It was a fear that some people within Allergan had based on secret pharmacokinetic studies that they had conducted that led them to think that it might be a problem, but when the trials were actually run, it turned out not to be a problem. And in that regard, I think In re Geisler is instructive, which we cite in our briefs, which says that if the inventors have an assumption about the world that turns out to be wrong later, it doesn't mean that people with skill in the art at the later point in time would necessarily share that assumption and be surprised. Can I ask you kind of a housekeeping question, and your friend can either confirm or reject what you're saying. There's this other case pending, the IPR case. Yes, Your Honor. My understanding is that the patents here are comprised some of what's pending, but that there are additional patents or claims that are at issue in the IPRs that are not covered by this case. There's an overlap. In other words, there's an overlap. All of these are covered in the IPRs, but the IPRs include other claims. That's correct, Your Honor. There are six patents at issue in the IPR appeal. There are only four patents at issue in this appeal. But the ones that are at issue in this appeal are also in the IPR. That's correct. I see that my time is just about up. I thank the court. If there are no further questions. Thank you, Your Honor. You agree with just the house? Yeah, that's correct. Sorry. On the blocking patent issue, the district court treated that, if you will, as sort of a per se that the patent, because it covered restasis, was a blocking patent. The point I was trying to make in my opening argument was the Accorda case talks about this being a factual-based inquiry. And as part of that inquiry, it ought to be the law that we can assess whether others' efforts, while they weren't after the same formulation as Allergan, were covered by the so-called blocking patent. That would inform the analysis of whether or not a patent that's, quote unquote, assumed to be blocking really is regarded in the industry as blocking. And the important point to remember about this patent is that it was exceedingly narrow. It related to requiring two particular excipients at particular levels. And so people were free to develop other cyclosporine formulations at their will. And therefore, the patent wasn't really regarded as blocking the ability to use cyclosporine to ultimately fill the need. And finally, I would just read for the court two things from Stevenson and compare to what the district court said. Stevenson talks about the Schirmer tier test at page A, 19.204, and says the most consistent improvements were in the cyclosporine A 0.1% group. And that at A, 19.203, says about the corneal staining, cyclosporine A 0.1% produced the greatest improvement from baseline in corneal staining. And the district court rejected that finding at page A, 50, based on the P values from the confidential phase 2 analysis. I see that I'm out of time. Thank you. Thank you. We thank both sides.